1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA ROBBINS, individually and as successor in interest to decedent MARIO PEREZ, RONIN RAY PEREZ, by and through his Guardian ad Litem, CYNTHIA ROBBINS, <br><br>                Plaintiffs, <br><br>    v. <br><br>CITY OF HANFORD, a municipal entity, CITY OF HANFORD POLICE DEPARTMENT, OFFICER DIENER, an individual, and OFFICER CHRIS JORDAN, an individual, <br><br>                Defendants. <br><br>_____ <br><br>AND RELATED CONSOLIDATED CASE <br>_____ | CIV F F 04-6672 AWI SMS <br><br>Consolidated with Case: <br>CV F 05-0147 OWW SMS <br><br>ORDER ON DEFENDANTS' MULTIPLE MOTIONS |

This is a civil rights case that stems from the shooting death of Mario Perez ("Decedent"). Plaintiffs Cynthia Robbins ("Robbins") and Ronin Ray Perez ("Ronin") filed suit in this Court and shortly thereafter, Plaintiffs Gloria Perez ("Perez") and Rachel Salazar ("Salazar") filed a separate suit. These cases were consolidated. All Plaintiffs are relatives of the Decedent and allege state and federal claims against the City of Hanford/the Hanford Police Department and

Officers Diener ("Diener") and Captain Jordan ("Jordan"), collectively "Defendants."

As to the federal claims,[1] Plaintiffs allege violations of 42 U.S.C. § 1983 against all Defendants for violating the Decedent's Fourth and Fourteenth Amendment rights through the use of excessive force, for failing to intervene to prevent the shooting of the decedent and to cover up the shooting, and for supervisor and *Monell* liability for ratification and improper policies/customs.  See Robbins Complaint at pp. 7-14.  Robbins and Ronin also allege a violation of their Fourteenth Amendment right to familial association against all Defendants based on the shooting of Decedent.  See id. at pp. 14-15.  Finally, Robbins and Ronin allege violations of 42 U.S.C. § 1985 and 42 U.S.C. § 1986 based on conspiracies to violate the Decedent's Fourth and Fourteenth Amendment rights by conspiring to deny the Decedent freedom from: (1) excessive force, (2) deprivation of liberty without due process, (3) cruel and unusual punishment, and (4) unwarranted interference with the Decedent's right to freely associate.[2]  See id. at 15-17.

Defendants have filed a motion to strike the punitive damages claims against the City of Hanford/the Hanford Police Department, motions for summary judgment based in part on lack of standing and qualified immunity, and a motion to add necessary parties under Rule 12(b)(7) with respect to Robbins and Ronin's state law wrongful death claim.[3]  For the reasons that follow, the motions for summary judgment will be granted and this case will be dismissed.

---

[1] Robbins and Ronin allege state law claims for assault and battery, wrongful death, and a survival cause of action for personal injury.

[2] Plaintiffs Perez and Salazar make similar claims except that they do not allege a Fourteenth Amendment violation of the right to familial association, do not allege conspiracy claims under 42 U.S.C. § 1985, 1986, and do not allege survival personal injury claims.  Their federal claims are based on violations of the Decedent's rights.

[3] Except for the motion to strike punitive damages and the Rule 12(b)(7) motion, Defendants originally filed three Rule 12(b)(6) motions to dismiss as to Perez, Salazar, and the Complaint of Robbins and Ronin.  These Rule 12(b)(6) motions were styled "in the alternative motion for summary judgment."  Defendants made arguments for summary judgment, submitted "external evidence," and filed separate statements of material facts.  Plaintiffs filed an opposition in which they also submitted external evidence, separate statements of disputed facts, and argued that summary judgment was not appropriate.  On May 12, 2006, the Court informed the parties that it was converting the 12(b)(6) motions to motions for summary judgment, moved the hearing date, and requested that Robbins file an additional affidavit to establish her standing under the California Survival Statute.

1

## SUMMARY JUDGMENT STANDARD

2      Summary judgment is appropriate when it is demonstrated that there exists no genuine

3  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

4  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

5  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

6  F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

7  undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

8  Exempt) Members Group Benefit Plan, 252 F.Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

9  case turns on a mixed question of law and fact and the only dispute relates to the legal

10  significance of the undisputed facts, the controversy for trial collapses into a question of law that

11  is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

12  1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

13          Under summary judgment practice, the moving party always bears the initial
           responsibility of informing the district court of the basis for its motion, and
14          identifying those portions of "the pleadings, depositions, answers to
           interrogatories, and admissions on file, together with the affidavits, if any," which
15          it believes demonstrate the absence of a genuine issue of material fact
   .
16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

17  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

18  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

19  file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

20  upon motion, against a party who fails to make a showing sufficient to establish the existence of

21  an element essential to that party's case, and on which that party will bear the burden of proof at

22  trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

23  nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

24  circumstance, summary judgment should be granted, "so long as whatever is before the district

25  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

26  satisfied."  Id. at 323.

27

28                                              3

1    If a moving party fails to carry its burden of production, then "the non-moving party has

2    no obligation to produce anything, even if the non-moving party would have the ultimate burden

3    of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

4    Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing

5    party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec.

6    Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d

7    at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles,

8    607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the

9    suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

10   Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.

11   2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

12   could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil,

13   322 F.3d at 1046.

14       In attempting to establish the existence of a factual dispute, the opposing party may not

15   rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

16   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

17   contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

18   391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However,

19   the opposing party need not establish a material issue of fact conclusively in its favor.  It is

20   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

21   parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City

22   of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to

23   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

24   trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 650 F.2d 129, 132 (9th

25   Cir. 1982).

26       In resolving a summary judgment motion, the court examines the pleadings, depositions,

27

28                                              4

answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Rule

56(c); Fortyune, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances

to consider materials that are not properly brought to its attention, but the court is not required to

examine the entire file for evidence establishing a genuine issue of material fact where the

evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas

Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified

Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be

believed, and all reasonable inferences that may be drawn from the facts placed before the court

must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475

U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless,

inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328

F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d

993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply

because a litigant claims that one exist or promises to produce admissible evidence at trial."  Del

Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Bryant v. Adventist

Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

      Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party

fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

**1.**     **MOTION FOR SUMMARY JUDGMENT REGARDING THE STANDING OF RACHEL SALAZAR AND GLORIA PEREZ**

<b>Background</b>

Perez and Salazar filed a complaint in this Court alleging that Defendants are liable to

1   them for allegedly violating the federal constitutional rights of the Decedent.  DMFP at ¶ 1;

2   DMFS at ¶ 1.[4]  According to Perez and Salazar's complaint, Decedent died as a result of this

3   alleged violation of constitutional rights.  DMFP at ¶ 2; DMFS at ¶ 2.  Perez is the aunt and

4   Salazar is the mother of Decedent.  DMFP at ¶ 3; DMFS at ¶ 3.  It is only on the basis of Perez's

5   status as an aunt of Decedent that she alleges that she has standing to assert her causes of action

6   against Defendants.  DMFP at ¶ 4.  Salazar asserts that she has standing solely on the basis that

7   she claims to be the Decedent's mother.  DMFS at ¶ 6.  Perez has not alleged any other basis for

8   standing to assert her Complaint other than her alleged family relationship as Decedent's aunt.

9   DMFP at ¶ 5.  Perez was never financially dependent upon Decedent and never expected to

10  receive any financial support from Decedent.  DMFP at ¶¶ 8-9.  Similarly, Salazar was not

11  financially dependent upon Decedent at the time of his death and did not expect that Decedent

12  would provide her financial support in the future.  DMFS at ¶¶ 4-5.  The Complaint filed by

13  Plaintiff Cynthia Robbins and Plaintiff Ronin Ray Perez explicitly identified themselves as both

14  the wife and child of Decedent.  DMFP at ¶ 10; DMFS at ¶ 9.  Plaintiff Cynthia Robbins asserted

15  in her complaint that she has standing to maintain her complaint against Defendants on the basis

16  that she is the successor in interest to the Decedent.  DMFP at ¶ 11; DMFS at ¶ 10.  Perez,

17  Salazar and Robbins are represented by the same law firm, both at the time when their

18  complaints were filed and at the time that Defendants filed the current motions with this Court.

19  DMFP at ¶ 12; DMFS at ¶ 11.

20       *Defendants's Motion*

21       Defendants argue that summary judgment is appropriate because neither Salazar nor

22  Perez have standing.  In their complaint, Salazar and Perez seek only to vindicate the Decedent's

23  constitutional rights.  However, neither Salazar nor Perez may vindicate the Decedent's rights

24  because Cynthia Robbins is the only Plaintiff who claims to be the successor in interest to

26  [4]"DMFP" refers to Defendants's undisputed material facts as to Gloria Perez.  "DMFS" refers to
27  Defendants's undisputed material facts as to Rachel Salazar.  Plaintiffs have filed their own statement of disputed
    material facts, but have not responded to Defendants's DMFP's or DMFS's.

28                                                    6

Decedent for purposes of the California survival statute. Because they do not claim to be the personal representative nor the successor in interest, they may not utilize the survival statute. Also, a wrongful death claim is inappropriate because the Decedent's wife and issue survived him and are parties to this consolidated action. Although Salazar is the Decedent's mother, she was not financially dependent upon the Decedent. Thus, as they lack standing, summary judgment against Salazar and Perez is appropriate.

*Plaintiffs's Opposition*

Salazar and Perez argue that they should be permitted to amend their complaint and allege state law claims for emotional distress. Salazar and Perez argue that they were present when Decedent was shot and that their relationship with Decedent was sufficiently close that they have a claim for intentional infliction of emotional distress. Salazar and Perez have submitted declarations in support of their argument that amendment is proper. Since they can state a cause of action that would be viable, amendment should be allowed and they should remain parties to this suit.

**Legal Standard**

"Standing is a necessary element of federal-court jurisdiction." Byrd v. Guess, 137 F.3d 1126, 1131 (9th Cir. 1998); Big Country Foods, Inc. v. Board of Education, 952 F.2d 1173, 1176 (9th Cir. 1992). Whether a "particular party has standing to pursue a claim naturally precedes the question of whether that party has successfully stated a claim." Moreland v. City of Las Vegas, 159 F.3d 365, 369 (9th Cir. 1998). The appropriate question of standing is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." Warth v. Seldin, 422 U.S. 490, 498 (1975) (citation omitted); Immigrant Assistance Project of the L.A. County Fed'n of Labor v. INS, 306 F.3d 842, 859 (9th Cir. 2002). As the Supreme Court has explained:

> The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e.,

with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presume that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

Lujan, 504 U.S. at 561 (internal citations omitted).

### State Law Wrongful Death

The statutory right to bring a wrongful death action in California "is grounded in the right to inherit from the decedent . . . [and] the purpose behind the wrongful death statute is to provide compensation for the loss of companionship and other losses resulting from decedent's death." Cheyanna M. v. A.C. Nielsen Co., 66 Cal.App.4th 855, 864 (1998). Standing to sue for wrongful death is governed by California Code of Civil Procedure § 377.60, and the category of persons eligible to bring wrongful death actions is strictly construed. Cal. Code Civ. Pro. § 377.60; Steed v. Imperial Airlines, 12 Cal.3d 115, 119-20 (1974); Bouley v. Long Beach Memorial Medical Center, 127 Cal.App.4th 601, 606 (2005); Chavez v. Carpenter, 91 Cal.App.4th 1433, 1438 (2001); Fraizer v. Velkura, 91 Cal.App.4th 942, 945 (2001); Marks v. Lyerla, 1 Cal. App. 4th 556, 559-60 (1991). A plaintiff who brings a wrongful death suit as an heir must establish the absence of issue by the decedent and the entitlement or propriety of the heir to seek recovery under § 377.60, i.e. that the heir actually has standing under § 377.60. See Nelson v. County of Los Angeles, 113 Cal.App.4th 783, 789 (2004); Coats v. K-Mart Corp., 215 Cal.App.3d 961, 969-70 (1989); Jolley v. Clemens, 28 Cal.App.2d 55, 74-75 (1938). Section 377.60(a) gives standing to "heirs" if those persons "'who would be entitled to the property of the decedent by intestate succession,' but only 'if there is no surviving issue of the decedent.'" Chavez, 91 Cal.App.4th at 1440 (quoting Cal. Code Civ. Pro. § 377.60(a)). A decedent's parents become heirs under the wrongful death statute when there is no surviving issue. Cal. Code Civ. Pro. § 377.60(a); Cal. Prob. Code, § 6402(b); Chavez, 91 Cal.App.4th at 1440. Where a decedent

8

leaves issue, "his parents would not be his heirs at all and therefore not entitled to maintain [a wrongful death] action at all." Chavez, 91 Cal.App.4th at 1440; Jolley v. Clemens, 28 Cal. App. 2d 55, 74 (1938).  However, "[r]egardless of their status as heirs, parents may sue for the wrongful death of their child 'if they were dependent on the decedent.'" Chavez, 91 Cal.App.4th at 1440 (quoting Code Civ. Pro. § 377.60(b)); see also Foster v. City of Fresno, 392 F.Supp.2d 1140, 1146 (E.D. Cal. 2005).  "'Dependence' refers to financial rather than emotional dependency . . . [and] a parent 'must show that they were actually dependent, to some extent, upon the decedent for the necessaries of life.'" Foster, 392 F.Supp.2d at 1146; Chavez, 91 Cal.App.4th at 1445.

*State Law Survival Claims*

"A claim under 42 U.S.C. § 1983 survives the decedent if the claim accrued before the decedent's death, and if state law authorizes a survival action." Tatum v. City & County of San Francisco, 441 F.3d 1090, 1094 n.2 (9th Cir. 2006) (citing 42 U.S.C. § 1988(a) and Moreland, 159 F.3d at 369).  "Under California law, if an injury giving rise to liability occurs before a decedent's death, then the claim survives to the decedent's estate." Tatum, 441 F.3d at 1094 n.2 (citing Cal. Civ. P. Code § 377.30).  "Where there is no personal representative for the estate, the decedent's 'successor in interest' may prosecute the survival action if the person purporting to act as successor in interest satisfies the requirements of California law . . . ." Id. (citing Cal. Civ. P. Code §§ 377.30, 377.32).

**Resolution**

The causes of action alleged in Salazar and Perez's complaint are based on the California wrongful death statute or on violations of the Decedent's individual rights.  Salazar and Perez's opposition do not address the substance of Defendants's motion.  It is undisputed that the Decedent's wife and child[5] survived the Decedent and are plaintiffs in this case.  Because Decedent is survived by his wife and child, neither Salazar nor Perez may bring a wrongful death

---

[5]Decedent is also survived by additional children who are not parties to this action.

9

1   suit as heirs of Decedent.  See Cal. Civ. P. Code § 377.60; Cal. Prob. Code § 6402; Chavez, 91

2   Cal.App.4th at 1440.  Also, since it is undisputed that Salazar was not financially dependent

3   upon Decedent, she does not have standing to sue as a financially dependent parent.  See Cal.

4   Civ. Code § 377.60.  With respect to survival causes of action, Robbins is the plaintiff identified

5   as the successor in interest in this consolidated case and there is no evidence that either Salazar

6   or Perez are successors in interest or personal representatives; accordingly, they have failed to

7   show standing under California's survival statute.  See Cal. Civ. P. Code §§  377.30, 377.32; see

8   also Tatum, 441 F.3d at 1094 n.2.  Additionally, by only arguing for the opportunity to amend

9   their complaint to add additional causes of action, Perez and Salazar are conceding that they lack

10  standing to pursue the causes of action alleged in their complaint.  Accordingly, summary

11  judgment in favor of Defendants on the issue of standing of Perez and Salazar is appropriate.

12  Given the resolution of the entirety of these motions, the Court will deny Salazar and Perez's

13  request to amend their complaint.

14

15  **2.     CYNTHIA ROBBINS AS SUCCESSOR IN INTEREST OF DECEDENT**

16          In Defendants's Rule 12(b)(7) motion,[6] Defendants raised the issue of Cynthia Robbins's

17  standing to bring survival causes of action.  Defendants argue that it is unknown if there is a

18  personal representative and point out that, although Robbins alleges to be the Decedent's

19  successor in interest, Robbins has failed to file an affidavit that comports with California Code of

20  Civil Procedure § 377.32, which is required in order to establish her status as successor in

21  interest.

22          In opposition, Robbins filed an affidavit that states in pertinent part:

23          At the time of the decedent's death, I was the legally married spouse of the
            decedent.

24

25  _____

26          [6]Defendants's Rule 12(b)(7) motion is based in part on the absence of Decedent's other children who are
    not parties.  Defendants raise the absence of the Decedent's other children because the California Wrongful Death
    statute generally requires that all viable claimants be joined as parties in a wrongful death case.  See 10 Witkin,

27  *Summary of California Law: Torts* §§ 1385-1387 (2005 ed.).

28                                                      10

> The decedent, MARIO PEREZ, died intestate.  The family members have made a diligent search and have found no will.
>
> At the time of his death, the decedent, MARIO PEREZ, did not own property of any significant value and no probate proceedings were legally necessary since there was no estate to distribute that would be subject to probate.  Furthermore, I am not aware of any creditors or other interested parties who have commenced a probate action in regard to the decedent's estate.

Robbins Declaration at ¶¶ 3-5.

**<u>Legal Standard</u>**

"It is well established that the federally protected rights that are enforceable under § 1983 are 'personal' to the injured party."  <u>Rose v. City of Los Angeles</u>, 814 F.Supp. 878, 881 (C.D. Cal. 1993).  Accordingly, "a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else."  <u>Archuleta v. McShan</u>, 897 F.2d 495, 497 (10th Cir. 1990); <u>Van Deelen v. Shawnee Mission Unified Sch. Dist. #512</u>, 316 F.Supp.2d 1052, 1056 (D. Kan. 2004); <u>Rose</u>, 814 F.Supp. at 881; <u>see also</u> <u>McKelvie v. Cooper</u>, 190 F.3d 58, 64 (2d Cir. 1999).  "As such, the question is not whether the [defendant] acted reasonably vis-a-vis the world at large.  Rather, the question is whether the [defendant] acted reasonably as against the plaintiff."  <u>Howerton v. Fletcher</u>, 213 F.3d 171, 173 (4th Cir. 2000).  However, under 42 U.S.C. § 1988, a § 1983 claim that accrued before death survives the decedent where state law authorizes a survival action as a "suitable remedy . . . not inconsistent with the Constitution and laws of the United States. . ."  42 U.S.C. § 1988; <u>Robertson v. Wegmann</u>, 436 U.S. 584, 588-90 (1978); <u>Rose</u>, 814 F.Supp. at 880.  A party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets the state's requirements for bringing a survival action.  <u>Moreland</u>, 159 F.3d at 369.

California law provides that, "a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period." Cal. Code Civ. Pro. § 377.20(a); <u>Chavez</u>, 91 Cal.App.4th at 1443.  "A cause of action that survives the death of the person . . . may be commenced by the decedent's personal representative or, if none,

11

by the decedent's successor in interest." Cal. Code Civ. Pro. § 377.30; Estate of Lowrie, 118 Cal.App.4th 220, 228 n.8 (2004).  A "'decedent's successor in interest' means the beneficiary of the decedent's estate[7] or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action." Cal. Code Civ. Pro. § 377.11; Lowrie, 118 Cal.App.4th at 228 n.10.  California Probate Code § 58 defines a "personal representative" as an "executor, administrator, administrator with the will annexed, special administrator, successor personal representative, or a person who performs substantially the same function under the law of another jurisdiction governing the person's status." Cal. Prob. Code § 58; Myers v. Philip Morris, Inc., 2003 U.S. Dist. LEXIS 13031, 17-18 (E.D. Cal. 2003); Rose, 814 F.Supp. at 881; Coats, 215 Cal.App.3d at 967.   Under California law:

> The person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest under this article, shall execute and file an affidavit or a declaration under penalty of perjury under the laws of this state stating all of the following:
>
> (1) The decedent's name.
>
> (2) The date and place of the decedent's death.
>
> (3) "No proceeding is now pending in California for administration of the decedent's estate."
>
> (4) If the decedent's estate was administered, a copy of the final order showing the distribution of the decedent's cause of action to the successor in interest.
>
> (5) Either of the following, as appropriate, with facts in support thereof:
> > (A) "The affiant or declarant is the decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeeds to the decedent's interest in the action or proceeding."
> > (B) "The affiant or declarant is authorized to act on behalf of the decedent's

---

[7]"Beneficiary of the decedent's estate" means:

(a) If the decedent died leaving a will, the sole beneficiary or all of the beneficiaries who succeed to a cause of action, or to a particular item of property that is the subject of a cause of action, under the decedent's will.

(b) If the decedent died without leaving a will, the sole person or all of the persons who succeed to a cause of action, or to a particular item of property that is the subject of a cause of action, under Sections 6401 and 6402 of the Probate Code or, if the law of a sister state or foreign nation governs succession to the cause of action or particular item of property, under the law of the sister state or foreign nation.

Cal Code Civ Pro. § 377.10.

successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) with respect to the decedent's interest in the action or proceeding.

(6) "No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding."

(7) "The affiant or declarant affirms or declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Cal. Code Civ. Pro. § 377.32(a); see also Dillard v. Curtis, 2004 U.S. Dist. LEXIS 22926, 20-21 (N.D. Cal. 2004); Myers, 2003 U.S. Dist. LEXIS 13031 at 17-18.  Further, a certified copy of the death certificate must be attached and, if the decedent's estate was administered, the declarant must also produce a copy of the final order showing distribution of the decedent's cause of action to the successor in interest.  Cal. Civ. P. Code § 377.32(a)(4), (c).  "Although Civil Procedure Code 377.32 is a rule of California (not federal) procedure, it seems to set a minimum threshold below which a person claiming to be a 'successor in interest' should not be permitted to slip . . . ."  Dillard, 2004 U.S. Dist. LEXIS 22926 at 21; see also Tatum, 441 F.3d at 1094 n.2.

### **Resolution**

When the Court informed the parties that it was converting the 12(b)(6) motions into motions for summary judgment, the Court stated that the standing of Cynthia Robbins as the successor in interest of Decedent was in dispute.  See Court's Docket Doc. No. 63.  The Court ordered Robbins to file an additional declaration, if she was legally able to do so, that conformed with Section 377.32.  Id.  The additional declaration was to be filed by May 24, 2006.  Id. However, no additional declaration has been filed.  The declaration that Robbins had previously filed in her original opposition indicates that the Decedent's name was Mario Perez, that Perez died intestate, that at the time of his death no probate proceedings were legally necessary since there was no estate to distribute that would be subject to probate, and that she is not aware of any creditors or other interested parties who have commenced a probate action in regard to the estate. Robbins's Declaration at ¶¶ 3-5.

Robbins's opposition declaration meets the requirements of Sections 377.32(a)(1), (4), and (7).  What is missing from the declaration is: (1) the date and place of Decedent's death, see

13

§ 377.32(a)(2); (2) the statement that "No proceeding is now pending in California for administration of the decedent's estate," see § 377.32(a)(3);[8] (3) either of the following statements supported by facts: "The affiant or declarant is the decedent's successor in interest . . . and succeeds to the decedent's interest in the action or proceeding," or "The affiant or declarant is authorized to act on behalf of the decedent's successor in interest . . . with respect to the decedent's interest in the action or proceeding," see § 377.32(a)(5)(A), (B); (4) the statement that "No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding," see § 377.32(a)(6); and (5) a certified copy of the death certificate. See § 377.32(c). Robbins did not request additional time to file the required declaration even though elements of Section 377.32 were missing from the opposition declaration. Given the Court's instruction for Robbins to file an additional declaration that comports with Section 377.32 if she was legally able to do so, the Court can only conclude that Robbins is not legally able to file the required declaration. It is Robbins's burden to establish standing under the California survival statute, which means that she is to follow the requirements of Section 377.32. See Tatum, 441 F.3d at 1094 n.2; Moreland, 159 F.3d at 369; Dillard, 2004 U.S. Dist. LEXIS 22926 at 21. Since Robbins has failed to properly establish her standing as the successor in interest of Decedent, she has not established standing to bring a survival cause of action. Robbins's claims that are based on violation of the Decedent's rights are dismissed.[9]

**3.    SUMMARY JUDGMENT AS TO ROBBINS AND RONIN'S  FEDERAL CLAIMS**

Robbins and Ronin assert causes of action under 42 U.S.C. §§ 1983, 1985, and 1986. The  § 1983 claims are based on a violation of the Decedent's Fourth and Fourteenth Amendment rights and a violation of their own Fourteenth Amendment right to familial

---

[8]Arguably the statement that "no probate proceedings were legally necessary" fulfills the substance of the requirement, although the required language is not used.

[9]Given the resolution of the remaining motions, the Court does not believe that leave to amend would be appropriate.

1  relationship.  Defendants move for summary judgment on multiple bases, including qualified

2  immunity.

3  _____          **Background**

4         Decedent suffered from a long history of mental illness prior to April 6, 2004.  DMFR at

5  ¶ 5.[10]  If Decedent decided to stop taking medication for his mental illness, then Decedent would

6  become violent towards his family members and other.  Id. at ¶ 6.  Prior to April 6, 2004,

7  Decedent had threatened people with a knife.  Id. at ¶ 7.  Decedent had physically attacked family

8  members and other persons prior to April 6, 2004.  Id. at ¶ 8.  Decedent had physically assaulted

9  his step-father, Manuel Hernandez, on April 5, 2004.  Id. at ¶ 9.  After Decedent attacked his

10  step-father on April 5, 2004, Decedent's mother (Salazar) sought assistance from mental health

11  professionals out of fear for the safety of herself and others on April 6, 2004.  Id. at ¶ 10.

12  Decedent's family members knew that Decedent was not taking medication for his mental illness

13  on or about April 6, 2004.  Id. at ¶ 11.

14         On April 6, 2004, Salazar actively sought assistance from mental health care

15  professionals for those professionals to order officers of the Hanford Police Department to place

16  Decedent in temporary custody pursuant to California Welfare and Institutions Code § 5150 so

17  that he could be evaluated by mental health professionals, which was done.  Id. at ¶ 12.  In order

18  to detain Decedent for evaluation by mental health care professionals pursuant to § 5150, Salazar

19  voluntarily and expressly granted access to officers of the Hanford Police Department to enter

20  her residency, located at 426 West Ivy Street, where Decedent was located, and unlocked the

21  front door.  Id. at ¶ 13.  Prior to officers of the Hanford Police Department entering Salazar's

22  residence, she told the officers and mental health care professionals that Decedent walked around

23  her residence with large knives and made threatening movements with those knives.  Id. at ¶ 14.

24

25

26  _____

27  [10]"DMFR" refers to Defendants's undisputed material facts as to Cynthia Robbins and Ronin Ray Robbins.
Plaintiffs have filed a separate statement of material disputed facts, but have not responded to Defendants's DMFR's.

28                                            15

Officers Smith[11] and Diener of the Hanford Police Department entered the residence at 426 West Ivy.  Decedent hid his right hand under a pillow on the couch where he was sitting in the living room from Smith and Diener when they initially entered the residence located at 426 West Ivy Street.  Id. at ¶ 15.  When Decedent removed his hand from under the pillow, Smith and Diener could see that Decedent possessed a large knife in his hand.  Id. at ¶ 16.  When officers of the Hanford Police Department were confronted by Decedent possessing a large knife, they repeatedly ordered Decedent to drop the large knife.  Id. at ¶ 17.  Decedent refused to drop the large knife he was carrying, even after repeatedly being ordered to do so by officers of the Hanford Police Department.  Id. at ¶ 18.  Decedent refused to follow the commands and orders given to him by officers of the Hanford Police Department.  Id. at ¶ 19.  Decedent made threatening movements with a large knife in his hand towards officers of the Hanford Police Department.  Id. at ¶ 20.  While inside the residence at 426 West Ivy Street, Decedent kept moving towards Smith while making threatening movements with a large knife in his hand towards Smith.  Id. at ¶ 21.  As Decedent was moving towards Smith with a large knife in his [Decedent's] hand, Smith retreated further and further into a corner of the living room since Decedent refused to follow orders from Smith and Diener to stop moving and drop the large knife that he was carrying.  Id. at ¶ 22.  After Decedent had forced Smith to retreat as far as he could into a corner of the living room and after Decedent repeatedly refused to obey orders to drop his knife and stop moving towards Smith, Smith shot Decedent.  Id. at ¶ 23.  Smith shot Decedent on April 6, 2004, out of fear for his own safety and the safety of others.  Id. at ¶ 24.

Officer Diener did not shoot Decedent.  Id. at ¶ 25.  Captain Jordan did not shoot Decedent.  Id. at ¶ 26.  Jordan arrived at 426 West Ivy Street only after Decedent was shot.  Id. at ¶ 27.  Hanford Police Department provides training to its police officers regarding the proper use of handguns.  Id. at ¶ 28.  Officer Diener was under the command of Jordan and others on April 6, 2004, when he was at 426 West Ivy Street.  Id. at ¶ 29.  Jordan was under the command of the

---

[11]Officer Smith is not a party to this lawsuit.

16

Police Chief of the Hanford Police Department on April 6, 2004, when he was at 426 West Ivy Street.  Id. at ¶ 30.

*Defendants's Argument*

Defendants argues that the above facts show that there was no violation of the Decedent's constitutional rights.  Defendants argue that Diener did not shoot the Decedent and that Diener's conduct was limited to entering the premises (which was with permission from Salazar), drawing his handgun, and ordering Decedent to stop moving towards Smith and to drop the knife.  These actions were reasonable under the circumstances and Diener is entitled to immunity.

With respect to Jordan, his only involvement occurred after Decedent had already been shot.  Jordan arrived at Salazar's residence because of his position as a supervisor in the Hanford Police Department.  Since Jordan had no involvement, he is entitled to immunity.

With respect to the City, liability is not possible because there was no longstanding practice or custom which constituted the "standard operating procedure," there was no policy decision made by a City official that had any impact on Decedent, and no final policymaking official delegated authority to, or ratified the improper conduct of, a subordinate.

Finally, with respect to Plaintiffs's conspiracy claims under § 1985 and § 1986, there is no conspiracy since the conduct of the officers was done in the open, at Salazar's request, and done for the purpose of effectuating a 5150 detention.  There is further no evidence of racial hatred or animosity, rather, the defendant officers were motivated by the complaints and requests of Salazar.  Since there was no conspiracy there was no conduct done in furtherance of a conspiracy. The Decedent was not deprived of a Constitutional right since he was armed and presented an immediate and present danger to the Hanford officers.  Given the Decedent's conduct, the Defendants could reasonably conclude that the act of shooting Decedent was necessary and constitutionally permitted.  As there was a constitutional basis to use lethal force against Decedent, there was no wrongful act committed.  Since there was no violation of § 1985, there can be no violation of § 1986.

1      *Plaintiffs's Opposition*

2              Plaintiffs argue that summary judgment is inappropriate.  First, additional discovery is

3      outstanding regarding the written policies of the Hanford Police Department after Captain Jordan

4      acknowledged that policies and procedures existed that applied to the conduct of the officers in

5      this case.  Plaintiffs had asked for, but not received, these policies, and the policies are necessary

6      so that Plaintiffs may support their claims.  Accordingly, it is premature to grant summary

7      judgment based on inadequate policies and procedures and it is premature to conclude that a

8      conspiracy cannot be proven.  Second, and more importantly, Plaintiffs argue that the declaration

9      of their police practices expert, David Dusenbury, raise genuine issues of material fact that go to

10     the reasonableness of the officers's conduct and that preclude summary judgment and immunity.

11             In support of the above arguments, Plaintiffs rely on six disputed facts: (1) Defendant

12     Jordan has indicated that policies and procedures regarding arrest, detention, use of lethal force,

13     and entry to residences exist and Plaintiffs have requested production of those documents, PDMF

14     No. 1;[12] (2) Plaintiffs's expert witness on police procedures and policies has indicated that

15     methods used in the arrest and detention of decedent were "wholly inappropriate" to the

16     situation, PDMF No. 2; (3) According to Plaintiffs's expert, the officers of the City of Hanford

17     did not employ suitable alternative methods of arrest and detention of the decedent that were

18     available for use, and that their failure to use alternatives likely resulted in decedent's death,

19     PDMF No. 3; (4) According to Plaintiffs's expert, the officers, particularly Officer Smith,

20     unreasonably escalated the violence of the circumstances surrounding the arrest and detention of

21     the decedent, PDMF No. 4; (5) The Plaintiffs's expert has opined that the conduct of defendants

22     in their arrest and detention of the decedent was "plainly incompetent and a knowing violation of

23     procedures and practices customary to the training of peace officers in the State of California,

24     PDMF No. 5; (6) The Plaintiffs's expert has opined that he will review the Defendants's own

25     policies and procedures, once those have been obtained through the discovery process.  PDMF

26     _____

27             [12]"PDMF" refers to Plaintiffs's Disputed Material Facts.

28                                                          18

No. 6.

The above disputed facts are based primarily on the declaration of expert witness Dave Dusenbury.  In his declaration, Dusenbury declares that he has reviewed materials in this case and that his pertinent conclusions are:[13]

Despite knowledge as to methods for dealing with mentally disabled persons; the availability of alternative methods designed to prevent the taking of human life; the availability of resources, training and equipment for use to deal effectively with such situations; and information from plaintiffs, particularly plaintiff Salazar, regarding the disposition of the decedent, peace officers employed by the City of Hanford Police Department utilized procedures and tactics that, predictably, resulted in the death of Mario Perez, and which were wholly inappropriate to the situation.  In particular, negotiation, the use of specially trained personnel utilizing less than lethal weaponry, and the effective use of time would have been the appropriate response by law enforcement and would most likely have prevented the necessity of lethal force.

According to the deposition testimony of supervising officer Jordan, peace officers of the City of Hanford Police Department had non-lethal methods for restraining non-criminal subjects of a Section 5150 detention, among which was the use of a human negotiator or the deployment of less than lethal weaponry, including non-lethal shotgun bean bag bullets, but no such non-lethal methods were employed despite their availability to officers employed in the department.  Although the resources of the King's County Sheriff's Department were available to the city peace officers, they were not sought or utilized.

In my review of Hanford Police Department Crime Report No. 04-2497, dated April 6, 2004, I noted that the health care worker who authorized the Section 5150 detention, Shannon Quinn, noted on his report that the officer who requested this authorization, Officer Diener, sought Shannon's authority because Diener did not want to, in Shannon's words, "cowboy it" (in other words, act recklessly or negligently).  However, this is precisely what Sergeant Smith did when he entered the residence without warning, without adequate preparation, and without any attempt to negotiate a peaceful exit by the decedent.  Instead of using tactics that would have prevented an escalation of the situation, Sergeant Smith focused on the assertion of his legal authority.  Although he had such authority under Section 5150 of the California Welfare and Institutions code, it was not reasonable for Sergeant Smith to assert his authority in the manner which was utilized and which unnecessarily escalated the violence of the circumstances leading to the decedent's death by shooting.

As an expert witness regarding peace officer practices and procedures, it is my opinion that the evidence indicates that the procedures and tactics employed by City of Hanford Police Department Officers on April 6, 2006, in their attempted detention of the deceden

---

[13]Dusenbury incorporates by reference Exhibit A, his 54 page initial report and credentials.  However, Plaintiffs do not point out any particular portion of the 54 page report.  See Plaintiffs's Separate Statement of Disputed Material Facts.

violation of procedures and practices customary to the training of peace officers in the State of California.  Furthermore, I have been informed that plaintiffs in this action have requested discovery of the Department's own practices and policies that I will review to determine whether they were sufficient or implemented during the event in question.

Dusenbury Declaration at ¶¶ 3A, 3B, 3C, 4.

**Legal Standard**

*Qualified Immunity*

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces."  Estate of Ford v. Rameriz-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  KRL v. Moore, 384 F.3d 1105, 1116 (9th Cir. 2004); Estate of Ford, 301 F.3d at 1049.

The first step in evaluating qualified immunity is to determine whether the plaintiff has shown conduct that violates his constitutional rights.  See Galvan v. Hay, 374 F.3d 739, 745 (9th Cir. 2004); Butler v. Elle, 281 F.3d 1014, 1021 (9th Cir. 2002).  That is, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001); Johnson v. County of Los Angeles, 340 F.3d 787, 792 (9th Cir. 2003).  If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Saucier, 533 U.S. at 201; KRL, 384 F.3d at 1115; Johnson, 340 F.3d at 792.  Under the second sequential step, the court determines: "(1) whether the violated right was clearly established, and (2) whether a reasonable public official could have believed that the particular

conduct at issue was lawful."[14]  Butler, 281 F.3d at 1021; Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993); see also KRL, 384 F.3d at 1115.  The plaintiff bears the burden of showing that the underlying right was clearly established at the time of the alleged misconduct. See Galvin, 374 F.3d at 745; Devereaux, 218 F.3d at 1051 (9th Cir. 2000).  If the plaintiff shows a clearly established right, the burden then shifts to the officer to prove that his actions were reasonable, even if they did violate the plaintiff's constitutional rights.  See Deveraux, 218 F.3d at 1051; Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995).

### Excessive and Deadly Force and Qualified Immunity

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Blanford v. Sacramento County, 406 F.3d 1110, 1115 (9th Cir. 2005); Quintanilla v. City of Downey, 84 F.3d 353 (9th Cir. 1996); see also Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003); Robinson v. Solano County, 278 F.3d 1007, 1009 (9th Cir. 2002) (en banc).  The Fourth Amendment reasonableness standard requires a court to balance the amount of force applied against the need for the use of that force.  Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002).  "A police officer may reasonably use deadly force where he has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Id.  Because objective reasonableness is a fact specific inquiry, courts must "pay careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. 386, 397 (1989); Blanford, 406 F.3d at 1115; Drummond, 343 F.3d

---

[14]The Ninth Circuit has characterized the qualified immunity analysis as both a two-part and three-part inquiry, but the particular characterization is not important.  See Schwenk v. Hartford, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000).  The consistent approach of the Ninth Circuit "has always been to 'determine whether a reasonable officer could have believed lawful the particular conduct at issue."  Id. (citation omitted).

at 1058; Billington, 292 F.3d at 1182.  Also, where it is or should be apparent that a seized

citizen is emotionally or mentally unstable, that is a factor that must be considered in determining

the reasonableness of the force employed.  Drummond, 343 F.3d at 1058.  The determination of

reasonableness must "be judged from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight," and must "embody allowance for the fact that police

officers are often forced to make split-second judgments –  in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that is necessary in a particular

situation."  Graham, 490 U.S. at 396-97; Drummond, 343 F.3d at 1058; Billington, 292 F.3d at

1182; Robinson, 278 F.3d at 1009.  Where officers work in close concert, "a court may consider

the collective knowledge of these [officers] in considering their beliefs concerning probable

cause or reasonable suspicion."  Burrell v. McIlroy, 423 F.3d 1121, 1124 (9th Cir. 2005).

Additionally, although the objective reasonableness standard for claims of excessive force

and the reasonableness standard embodied in qualified immunity are similar, the inquiries are

distinct and must be analyzed in the proper order.  See Saucier, 533 U.S. at 201-6; Robinson, 278

F.3d at 1012.  Accordingly, in excessive force cases, the court must "ask first whether the facts

taken in the light most favorable to the plaintiff would establish a violation fo the Fourth

Amendment.  Only if the answer is in the affirmative should the immunity issue be addressed."

Robinson, 278 F.3d at 1012; see also Saucier, 533 U.S. at 201; Drummond, 343 F.3d at 1056.  If

the facts presented show a Fourth Amendment violation, the Court addresses immunity by

determining whether the law was clearly established at the time such that "it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533

U.S. at 201; Drummond, 343 F.3d at 1056; Robinson, 278 F.3d at 1012.

### *Fourteenth Amendment Right To Familial Relationships*

"It is well established that a parent has a fundamental liberty interest in the

companionship and society of his or her child and that the state's interference with that liberty

interest without due process of law is remediable under 42 U.S.C. § 1983."  Toguchi v. Chung,

1  391 F.3d 1051, 1060 (9th Cir. 2004); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 685 (9th Cir.

2  2001).  The constitutional interest in familial companionship and society protects against

3  deprivations that are a result of "unwarranted state interference."  <u>See Lee</u>, 250 F.3d at 685;

4  <u>Smith v. City of Fontana</u>, 818 F.2d 1411, 1418 (9th Cir. 1987);[15] <u>Crowe v. County of San Diego</u>,

5  359 F. Supp. 2d 994, 1039 (S.D. Cal. 2005).  Where a claim for interference with familial

6  relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be

7  unconstitutional, a finding that the other conduct was constitutional generally will preclude

8  recovery for interference with familial relationship.  <u>See Gausvik v. Perez</u>, 392 F.3d 1006, 1008

9  (9th Cir. 2004); <u>Schaefer v. Goch</u>, 153 F.3d 793, 799 (7th Cir. 1998) ("Because we have

10 concluded that Sergeant Goch did not violate Kathy Nislowski's rights under the Constitution,

11 her parents' claims based on the loss of her society and companionship necessarily fail as well.");

12 <u>Crowe</u>, 359 F.Supp.2d at 1039.

13                              <u>**Resolution**</u>

14        The Court has already determined that Robbins has not established standing as the

15 Decedent's successor in interest for purposes of the 42 U.S.C. §§ 1983, 1985, and 1986 claims

16 that are based on a violation of Decedent's rights.[16]  However, Robbins and Ronin clearly have

17 standing to assert a violation of their substantive due process rights to a familial relationship with

18 Decedent.  Defendants move for summary judgment on the bases of qualified immunity for

19 Diener and Jordan and that there is no violation of Decedent's rights.  Robbins and Ronin's

20 Fourteenth Amendment familial relationship claim incorporates all prior paragraphs and is based

21

22        [15]Overruled on other grounds by <u>Hodgers-Durgin v. De La Vina</u>, 199 F.3d 1037 (9th Cir. 1999).

23        [16]Additionally, under their First Cause of Action, Robbins and Ronin seem to allege that Defendants
24 violated the Decedent's Fourteenth Amendment rights by engaging in a cover up after the shooting.   To the extent
   Robbins and Ronin are alleging violations of the Decedent's rights that are based on conduct occurring after the
25 Decedent's death, such claims are improper because"the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985, does not
   provide a cause of action on behalf of a deceased based upon alleged violation of the deceased's civil rights which
26 occurred after his death.  A 'deceased' is not a 'person' for the purposes of 42 U.S.C. §§ 1983 and 1985, nor for the
   constitutional rights which the Civil Rights Act serves to protect."  <u>Guyton v. Phillips</u>, 606 F.2d 248, 250 (9th Cir.
   1979); <u>see also Judge v. City of Lowell</u>, 160 F.3d 67, 76 (1st Cir. 1998).

27

28                              23

on the same conduct that forms the basis of the excessive force and failure to intervene claims as to the Decedent.  See Plaintiffs's Complaint at pp. 4-6, 14-15.  In other words, all of the federal claims alleged in this case are essentially based on the shooting of the Decedent.  If there was no constitutional violation that occurred during the shooting of Decedent, then there was no "unwarranted interference" with Robbins and Ronin's substantive due process right to familial relationship with Decedent.  See Gausvik, 392 F.3d at 1008; Schaefer, 153 F.3d at 799; Crowe, 359 F.Supp.2d at 1039.

Here, there is no apparent violation of the Fourth Amendment with respect to the shooting of Decedent.  In terms of the *Graham* factors, there was no crime at issue.  However, Hanford police officers went to Salazar's home, at the request of Salazar, in order to place Decedent in temporary custody under California Health & Welfare section 5150.  Section 5150 in pertinent part authorizes a peace officer to take into custody "any person [who], as a result of a mental disorder, is a danger to others, or to himself or herself, or gravely disabled."  Cal. Wel. & Inst. Code § 5150.[17]  The officers collectively were aware that Decedent had a history of violence, had not been taking his medication, and had assaulted a family member.  See DMFR Nos. 12, 14; Exhibit T to Mills Declaration pp. 34-38.  Accordingly, the purpose of the officers being present and confronting Decedent was to effectuate a 5150 detention, requested by Salazar, because the Decedent posed a danger to those around him due to violent behavior.  DMFR 10.

---

[17]Welfare & Institutions Code Section 5150 provides in its entirety:

When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled. If the probable cause is based on the statement of a person other than the officer, member of the attending staff, or professional person, such person shall be liable in a civil action for intentionally giving a statement which he or she knows to be false

Also, the Decedent was not cooperating with the Hanford police officers. Although he was not "evading" arrest in the sense that he was not fleeing and he was not resisting arrest in the sense that there was no fist fight with the officers, the Decedent did not acquiesce or respond to the officers's commands. See DMFR Nos. 17-23. In particular, Officers Smith and Diener repeatedly told Decedent to drop the large knife that he was wielding and to stop moving towards Smith. Id. That the Decedent did not obey these commands, was making threatening motions with the knife, and backing Smith into a corner shows resistance.

Also, given the very nature of a Section 5150 encounter, it must be considered that Decedent was mentally unstable and that the officers were aware of this instability. However, the Decedent's mental instability expressed itself through violence against family members, a refusal to obey lawful commands, swinging a knife in a threatening manner, and cornering Smith. See id. at 5-23. Although the Decedent was not a criminal, this situation is different from those in cases like *Drummond*, where Drummond was agitated and hallucinating in a parking lot but apparently not threatening others, see Drummond, 343 F.3d at 1058, and in *Deorle*, where Deorle was physically compliant and followed the instructions of officers including dropping a hatchet and an unloaded crossbow. See Deorle v. Rutherford, 272 F.3d 1272, 1276-78 (9th Cir. 2001). In this case, the Decedent was non-compliant and physically aggressive towards the officers.

Finally, the Decedent posed an immediate threat to Diener and Smith, and in particular Smith, at the time of the shooting. As discussed above, Diener and Smith ordered the decedent to drop the large knife and to stop moving towards Smith. See id. at 17-23. Despite the multiple commands, the Decedent did not drop the knife, continued to wield it in a threatening manner, and backed Smith into a corner. Id. At the time Smith shot the decedent, Smith could not retreat any further and was in fear for his life. Id. at 23-24. Given the Decedent's conduct of backing Smith into a corner while making threatening motions with the knife and the Decedent's prior history of violence, the Decedent posed an imminent threat to Smith and Diener.

In light of the above, Smith had probable cause to believe that the Decedent posed a

threat of serious bodily injury to Smith at the time of the shooting.  See Blanford, 406 F.3d at

1115-18; Billington, 292 F.3d at 1185; see also DMFR No. 24.  Further, there is nothing

objectively unreasonable in Diener ordering decedent to drop the knife and to stop moving

towards Smith.  It was constitutionally reasonable for Diener to give orders to the Decedent and

for Smith to utilize deadly force against the Decedent under these circumstances.[18]

The issues raised by the Dusenbury declaration are essentially that Diener and Smith

utilized flawed or erroneous tactics.[19]  See Dusenbury Declaration at ¶¶ 3A, 3B, 3C, 4.  However,

merely negligent tactics are insufficient to establish a violation of the constitution.  See

Billington, 292 F.3d at 1190; Bartsch v. City of Yakima, 2006 U.S. Dist. LEXIS 5274 at *13

(E.D. Wash. January 23, 2006).  "Section 1983 imposes liability for violations of right protected

by the Constitution, not for duties of care arising out of tort law. Remedy for the latter type of

injury must be sought in state court under traditional tort-law principles."  Baker v. McCollan,

443 U.S. 137, 146 (1979); Kohl v. Smythe, 25 F. Supp.2d 1124, 1128 (D. Haw. 1998); see also

Toguchi, 391 F.3d at 1060 ("Liability for negligently inflicted harm is categorically beneath the

threshold of constitutional due process.").

This is not to say that Ninth Circuit precedent forbids "consideration of the events leading

up to a shooting," but "neither do they permit a plaintiff to establish a Fourth Amendment

violation based merely on bad tactics that result in a deadly confrontation that could have been

avoided."  Billington, 292 F.3d at 1190; Bartsch, 2006 U.S. Dist. LEXIS at *13.  "Where an

officer intentionally or recklessly provokes a violent confrontation, if the provocation is an

independent Fourth Amendment violation, [the officer] may be held liable for his otherwise

---

[18]"There is no question in this case that [Officer Smith's] firing of [his gun] . . . constituted deadly force, whether defined as force reasonably likely to cause death (as it was at the time of the events giving rise to this case) or as force creating a substantial risk of causing death or serious bodily injury (as it is today)."  Blanford, 406 F.3d at 1115 n9.

[19]Even Dusenbury seems to acknowledge that the actual shooting was necessary when he opines that different tactics would have "prevented the **necessity** of lethal force."  Dusenbury Declaration at ¶ 3A (emphasis added).

defensive use of deadly force." <u>Billington</u>, 292 F.3d at 1189.  "The basis of liability for the subsequent use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard." <u>Id.</u> at 1190.

> [T]he fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself.  The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability.  An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable' officer.  Thus, even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.
>
> But if . . . an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law. In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force.

<u>Id.</u> at 1190-91; <u>Bartsch</u>, 2006 U.S. Dist. LEXIS at *14-*15.

Here, the Court does not see any conduct that can be considered an independent constitutional violation.  Smith and Diener responded to Salazar's request for a 5150 detention. It is undisputed that Salazar had the authority to grant permission for Smith and Diener to enter the residence.  <u>See</u> DMFR Nos. 10-13.  Entering a residence with the permission of one who has authority to grant entrance does not violate the Fourth Amendment.  <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 188-89 (1990); <u>Zimmerman v. Bishop Estate</u>, 25 F.3d 784, 788 (9th Cir. 1994). When Officers Smith and Diener entered the residence, the Decedent was sitting down and had his hand under a pillow.  <u>See</u> DMFR No. 16.  The Decedent then stood up and revealed that he had a large knife.  <u>See id.</u> at 17.  Smith and Diener then ordered the Decedent to drop the knife, but Decedent did not comply.  <u>See id.</u> at 18.  From the undisputed facts submitted to this Court, the officers simply walked into the house, the Decedent stood up with the large knife, and refused to drop the knife despite the officers's orders to do so.  These facts do not show a violation of the Constitution.  Diener and Smith's initial conduct involved no force, was with permission and at the request of a resident of the residence, and the order to drop the knife is a natural response to

27

1  the situation.  The initial conduct was objectively reasonable under the Fourth Amendment and

2  there have been no cases cited that suggest that it was unconstitutional.

3       The criticisms of Dusenbury are that other alternatives were available to the officers and

4  that Smith and Diener's conduct is contrary to standard police training and procedures.

5  However, "the fact that an expert disagrees with an officer's actions does not render the officer's

6  actions unreasonable."  Billington, 292 F.3d at 1189; Reynolds v. County of San Diego, 84 F.3d

7  1162, 1169 (9th Cir. 1996).  This "prevents a plaintiff from avoiding summary judgment by

8  simply producing an expert's report that an officer's conduct leading up to a deadly confrontation

9  was imprudent, inappropriate, or even reckless."  Billington, 292 F.3d at 1189. Dusenbury's

10  criticisms perhaps raise questions of negligence, but they do not show a violation of the Fourth

11  Amendment.  See id. at 1189-91; Bartsch, 2006 U.S. Dist. LEXIS at *13-*16.  The arguably

12  negligent tactics were not in themselves violations of the Fourth Amendment and thus, cannot

13  form the basis of liability for the shooting of the Decedent.  See Billington, 292 F.3d at 1189-91;

14  Bartsch, 2006 U.S. Dist. LEXIS at *13-*16.

15       Furthermore, to the extent that Ronin and Robbins rely on a failure by Diener and Jordan

16  to intervene to prevent the shooting of the Decedent, i.e. a violation of the Decedent's due

17  process right to bodily safety, see Wood v. Ostrander, 879 F.2d 583, 588 (9th Cir. 1988), the

18  facts do not support such a violation.  First, Jordan was not present at the time of the shooting

19  and could not possibly have intervened.  See DMFR No. 27; see also Motley v. Parks, 432 F.3d

20  1072, 1082 (9th Cir. 2005).  Second, as described above, the use of deadly force by Smith was

21  defensive and reasonable and the conduct proceeding the shooting did not violate the

22  Constitution.  Thus, there was no Constitutional injury suffered by Decedent that Diener could

23  have prevented.  Finally, the Ninth Circuit has explained that a non-shooting officer may be

24  liable for a deprivation of Constitutional rights if the officer failed to perform an act which he

25  was legally required to do which was the cause in fact of the injuries.  Ting v. United States, 927

26  F.2d 1504, 1511-12 (9th Cir. 1991).  An officer is generally under no duty to protect persons

27

28                                                            28

from harm from third parties, except when a "special relationship" exists between the officer and the injured citizen or the officer created the danger.  <u>L.W. v. Grubbs</u>, 974 F.2d 119, 121 (9t h Cir. 1992); <u>see also</u> <u>Ting</u>, 927 F.2d at 1511-12.  "To determine whether a 'special relationship' exists, a court may look to a number of factors, including (1) whether the state created or assumed a custodial relationship toward the plaintiff; (2) whether the state affirmatively placed the plaintiff in a position of danger; (3) whether the state was aware of a specific risk of harm to the plaintiff; or (4) whether the state affirmatively committed itself to the protection of the plaintiff." <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 700 (9th Cir. 1988).  Here, there is no special relationship between either Officer Diener or Captain Jordan and the Decedent and Diener did not create the danger of Smith shooting the Decedent.  There is no evidence that Decedent was ever in the custody of Diener and Smith until after Smith shot Decedent in self-defense, <u>cf.</u> <u>California v. Hodari D.</u>, 499 U.S. 621, 628-29 (1991) (noting that no seizure occurs when a person does not submit to a show of authority by peace officers), the officers did not affirmatively place Decedent in a position of danger as the Decedent remained in his mother's house during the entire encounter and the officers simply walked into the house, <u>see</u> <u>Kennedy v. Ridgefield City</u>, 439 F.3d 1055, 1063 (9th Cir. 2006) ("In examining whether an officer affirmatively places an individual in danger . . . we examine whether the officer left the person in a situation that was more dangerous than the one in which they found him."); <u>cf.</u> <u>Wood</u>, 879 F.2d at 588 (officer arrested driver of car and left Wood alone on a side walk in a known high violent crime area where she was subsequently raped), there is no evidence that Officer Smith posed any threat to the Decedent, let alone that Diener should have known of such a threat, especially as Smith's use of deadly force was defensive and reasonable, and there is no evidence that Diener or Jordan committed themselves to the protection of Decedent from Smith.  Moreover, the evidence does not suggest that Diener acted with deliberate indifference to the "danger" that Smith would shoot the Decedent.  <u>See</u> <u>Kennedy</u>, 439 F.3d at 1064.  The officers walked into the house, the Decedent then arose, started wielding a knife in a dangerous manner, backed Smith into a corner,

and would not stop advancing.  It is unclear how Diener could have intervened or what Diener could have done given the timing of this confrontation and given that Decedent was the aggressor.  Since there is no evidence of "special relationship" or "danger creation," see L.W., 974 F.2d at 121, there is inadequate evidence that Diener or Jordan unconstitutionally failed to intervene to prevent Smith from shooting the Decedent.

Accordingly, the evidence presented does not show a violation of the Constitution with respect to the shooting of the Decedent.  Since Robbins and Ronin's Fourteenth Amendment claims are based on the shooting of Decedent, and the shooting did not violate the Constitution, there was no "unwarranted interference" with Robbins and Ronin's substantive due process right to familial relationship with the Decedent.  See Gausvik, 392 F.3d at 1008; Schaefer, 153 F.3d at 799; Crowe, 359 F.Supp.2d at 1039.  Because Robbins and Ronin's Fourteenth Amendment rights were not violated, there is no further analysis necessary for qualified immunity. Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003).

Further, Robbins and Ronin's Fourteenth Amendment claim is against all defendants. However, because the individual Hanford police officers did not violate the Fourteenth Amendment Constitutional rights of Robbins and Ronin on April 6, 2004, there is no municipal or supervisor liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Jackson v. City of Bremerton, 268 F.3d 646, 653-54 (9th Cir. 2001); Quintanilla, 84 F.3d at 356; Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994); Zimmerman, 25 F.3d at 788; Palmerin v. Riverside, 794 F.2d 1409, 1414-15 (9th Cir. 1986).

**4.     STATE LAW CLAIMS**

Defendants also request summary judgment on Plaintiffs's state law claims and have requested that necessary parties be added for purposes of Plaintiffs's wrongful death claim. However, there are now no federal claims left in this case.

Jurisdiction in this case was based on the presence of a federal question and the Court had

1   supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  "A district

2   court may *sua sponte* determine whether to exercise supplemental jurisdiction over state law

3   claims." <u>Martinez v. Mono County</u>, 2006 U.S. Dist. LEXIS 3089 at *11 (E.D. Cal. 2006);

4   <u>Ballard v. Equifax Check Servs., Inc.</u>, 186 F.R.D. 589, 599 (E.D. Cal. 1999)).  Under 28 U.S.C. §

5   1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law

6   claims if "the district court has dismissed all claims over which it has original jurisdiction."

7   Generally, "when federal claims are dismissed before trial . . . pendent state claims should also be

8   dismissed." <u>Religious Tech. Ctr v. Wollersheim</u>, 971 F.2d 364, 367-68 (9th Cir. 1992).  Here,

9   there are no longer any federal claims left, there is still some outstanding discovery, <u>see</u> Polik

10  Declaration In Opposition To Motion To Dismiss Complaint or In the Alternative Summary

11  Judgment, and there is a claim that there are minors who are necessary parties under State law

12  with respect to State law claims.  <u>See</u> Defendants's Rule 12(b)(7) Memorandum of Points and

13  Authorities; <u>see also</u> 10 Witkin, *Summary of California Law: Torts* §§ 1385-1387 (2005 ed.).

14  Given these considerations, the Court declines to exercise jurisdiction over the remaining state

15  law claims.  <u>See</u> 28 U.S.C. § 1367(c)(3); <u>Wollersheim</u>, 971 F.2d at 367-68; <u>Martinez</u>, 2006 U.S.

16  Dist. LEXIS 3089 at *11.  Accordingly, Robbins and Ronin's state law claims are dismissed

17  without prejudice and Defendants's Rule 12(b)(7) motion is denied as moot.

18

19                                                 **<u>CONCLUSION</u>**

20          Defendants have moved for summary judgment based on, *inter alia*, lack of standing and

21  qualified immunity.  With respect to Plaintiffs Perez and Salazar, no evidence has been presented

22  that shows that either have standing under the California Wrongful Death statute or the

23  California Survival statute.  Given Salazar and Perez's opposition, which simply seeks to add

24  state law claims of emotional distress, they concede that they do not have standing to bring the

25  causes of action alleged in their complaint.  Since they have not demonstrated standing under the

26  wrongful death statute or standing to pursue violations of the Decedent's rights, summary

27

28                                                       31

1  judgment is appropriate as to the claims alleged by Salazar and Perez.

2        With respect to Robbins and Ronin's Fourteenth Amendment claim for unwarranted

3  interference with their familial relationship with the Decedent, summary judgment is also

4  appropriate.  This claim is based on the shooting of the Decedent.  However, the evidence

5  submitted at best shows negligent conduct by Officers Diener and Smith.  The evidence shows

6  that the conduct of Diener and Smith at the time of the shooting was objectively reasonable under

7  the Fourth Amendment and the conduct leading up to the shooting also did not violate the

8  Constitution.  Furthermore, the evidence does not show a constitutional violation for Diener's

9  "failure to intervene."  Smith's use of force was defensive and reasonable under the

10  circumstances, there existed no special relationship with the Decedent, Diener did not "create the

11  danger," it is unclear how Diener could intervene given the timing and the circumstances, and

12  Jordan was not even present at the scene.  Since the shooting of the Decedent did not violate the

13  Constitution, there was no "unwarranted interference" with Robbins and Ronin's Fourteenth

14  Amendment right to familial association with the Decedent.  Furthermore, because there was no

15  violation of the Constitution by the individual officers, there is also no municipal or supervisor

16  liability.  Summary judgment is appropriate with respect to Robbins and Ronin's Fourteenth

17  Amendment claims.

18        With respect to Robbins as successor in interest, the Court informed Robbins that her

19  standing was at issue and requested that she file an affidavit that complied with the requirements

20  of California Code of Civil Procedure § 377.32 so as to establish her standing to bring suit as the

21  Decedent's successor in interest.  Robbins failed to do so and thus, did not establish her standing

22  as the successor in interest of the Decedent.  Accordingly, Robbins's claims under 42 U.S.C. §§

23  1983, 1985, and 1986 that are based on a violation of the Decedent's constitutional rights are

24  dismissed since Robbins has not demonstrated her status as successor in interest.

25        Finally, with respect to Robbins and Ronin's state law claims and Defendants's Rule

26  12(b)(7) motion, the Court had supplemental jurisdiction over the state law claims.  However,

27

28                                                    32

there are now no viable federal claims left in this case.  Accordingly, the Court declines supplemental jurisdiction over Plaintiffs's state law claims.

Accordingly, IT IS HEREBY ORDERED that:

1.    Summary judgment in favor of Defendants regarding the standing of Gloria Perez and Rachel Salazar is GRANTED;

2.    Robbins and Ronin's claims under 42 U.S.C. §§ 1983, 1985 and 1986 which are based on violations of the Decedent's rights are DISMISSED;

3.    Summary judgment in favor of Defendants regarding Robbins and Ronin's 42 U.S.C. § 1983 claim that is based on Robbins and Ronin's Fourteenth Amendment right to familial association is GRANTED;

4.    The Court declines to exercise supplemental jurisdiction over Robbins and Ronin's state law claims and those claims are DISMISSED without prejudice;

5.    Defendants's motion to strike is DENIED as moot;

6.    Defendants's Rule 12(b)(7) motion is DENIED as moot; and

7.    The clerk of the Court is directed to close this case.

IT IS SO ORDERED.

**Dated:    June 16, 2006**              _____/s/ Anthony W. Ishii_____
0m8i78                                    UNITED STATES DISTRICT JUDGE